WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| United States of America, | No. CR-17-00804-001-PHX-GMS |
|---|---|
| Plaintiff, | **ORDER** |
| v. | |
| James Dee Gilmore, Jr., | |
| Defendant. | |

Pending before the Court is Defendant James Dee Gilmore's Motion to Suppress Statements and Request for Voluntariness Hearing. (Doc. 20). For the reasons stated below, the motion is granted in part and denied in part.

## BACKGROUND

On May 16, 2017 at 2:35pm, Defendant James Gilmore drove a truck into the United States through the San Luiz, Arizona Port of Entry. Customs and Border Protection (CBP) officers found evidence of contraband in the spare tire of the truck. CBP officers handcuffed Mr. Gilmore and escorted him to the secondary inspection area. Mr. Gilmore told the CBP officer that he worked as a hay loader and was driving to Yuma. Mr. Gilmore said that the truck was owned by a mechanic in Mexico. The CBP officers found a plastic bag with methamphetamine in Mr. Gilmore's pocket, after which they escorted Mr. Gilmore to a holding cell. Meanwhile, other officers confirmed that the spare tire in Mr. Gilmore's truck contained forty-seven pounds of Methamphetamine.

At some point, CBP Officer Soto visited the cell to take Mr. Gilmore's intake photo. Soto recognized Mr. Gilmore from a previous encounter at the border. Mr. Gilmore claims in his briefing that Officer Soto told him that he should "work with the Feds—that if he worked with them he would probably go home." Mr. Gilmore also claims that Officer Soto later returned to the cell and encouraged Mr. Gilmore to work with the special agents before his transfer to the county jail. Officer Soto said that they had found a lot of drugs in the spare tire and that other people were released to go home after they spoke with agents and told them truth. Mr. Gilmore claims that Special Agent Sheridan then came to the holding room and said that he heard from Officer Soto that Mr. Gilmore wanted to talk. Mr. Gilmore said, "I guess." Special Agent Sheridan said that it could take a few days to get an attorney, and that they might be able to clear up the problem now if Mr. Gilmore revoked the invocation of his rights.

At hearing, Officer Soto testified that he took Mr. Gilmore's photo and asked if Mr. Gilmore remembered their previous encounter. He further said, "well you just got to be honest." He then asked Mr. Gilmore what he did for work, but that there was no other interchange between them.

At 5:40pm, Mr. Gilmore was escorted to an office for questioning with Homeland Security Investigations Special Agents Crawford and Sheridan. After brief introductions, Agent Crawford asked "Do you have an idea of why you're here?" and Mr. Gilmore responded, "Somewhat. I mean, I knew I was – that thing I as supposed to throw away in my pocket but I – I didn't get it thrown away, like, I supposed to. I forgot about it." The special agents then advised Mr. Gilmore of his *Miranda* rights. When they asked, "Would you like to speak with us or would you rather speak with an attorney?" Mr. Gilmore asked whether he was being held for the bag in his pocket, and when the special agents stated that the CBP officers discovered Methamphetamine in the spare tire, he said, "I think I . . . wanna speak with attorney I think." As the special agents ended the interrogation, Mr. Gilmore made several unsolicited statements about his truck and his intended destination. Agent Sheridan then asked standard booking questions and

1 escorted Mr. Gilmore to a holding cell. During questioning, Mr. Gilmore noted that he
2 was experiencing stomach pain and asked for Tylenol and to see a doctor. The special
3 agents told him that he could see a doctor when they transferred him to the county jail.
4 The facts of the first interrogation are undisputed.

The videotapes taken of persons accessing Mr. Gilmore's holding cell show no interaction between Mr. Gilmore and Mr. Soto after he was removed from his holding cell and invoked his right to an attorney. But, according to testimony, at 6:27pm, someone called Agent Crawford and told her that Mr. Gilmore wanted to speak with her and Agent Sheridan. After deliberating about whether a suspect could revoke their right to have an attorney, the special agents determined that Mr. Gilmore could speak with them, and they escorted Mr. Gilmore back to their office.

The parties do not dispute the details of the second interview. At 6:47pm, Special Agent Crawford said to Mr. Gilmore, "you asked to speak with us again and to un-invoke your rights and you wanted to talk to us." Mr. Gilmore responded, "Mm-hm" and nodded his head in agreement. The special agent then read the *Miranda* warnings. Mr. Gilmore said, "Yeah I'll wave my rights." He took a written document listing his rights, initialed each right that he was waving, and then signed and dated the document. The special agents then conducted an interrogation for one hour.

After the interrogation, Special Agent Sheridan escorted Mr. Gilmore to the Yuma County detention center. Agent Sheridan testified that Mr. Gilmore made several unsolicited statements during the drive, including information about a drug trafficker who recruited him and the process and price to traffic drugs. Mr. Gilmore stated that he rejected this offer.

**DISCUSSION**

**I.    Miranda Waiver**

Mr. Gilmore asks the Court to suppress his statements "made after he was stopped at the border and drugs were found in the spare tire of the vehicle he was driving . . . because they were custodial statements elicited after Mr. Gilmore had invoked his right to

counsel." (Doc. 20). Mr. Gilmore made incriminating statements to law enforcement in three separate circumstances. Each is analyzed separately.

### A. Mr. Gilmore's First Interrogation with Agents Crawford and Sheridan

#### 1. Legal Standard

The U.S. Constitution guarantees a criminal suspect the right to an attorney, U.S. CONST. amend. VI, and the right to not "be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. To protect these rights, the U.S. Supreme Court adopted preventative measures that require law enforcement officers to warn suspects of their rights (i.e. *Miranda* warnings) before conducting a custodial interrogation. *Maryland v. Shatzer*, 559 U.S. 98, 105 (2010) (citing *Miranda v. Arizona*, 384 U.S. 436, 445, 479 (1966)).

Interrogation refers "to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). Routine booking questions "rarely elicit an incriminating response," and therefore do "not constitute interrogation sufficient to trigger constitutional protection." *United States v. Gonzalez–Sandoval*, 894 F.2d 1043, 1046 (9th Cir. 1990). The booking exception may apply to questioning after a suspect has invoked the right to counsel. *United States v. Zapien*, 861 F3d 971, 976 (9th Cir. 2017) (citing *United States v. Foster*, 227 F.3d 1096, 1103 (9th Cir. 2000)).

The suspect may waive the rights, but the waiver must be "made voluntarily, knowingly, and intelligently." 384 U.S. at 444. Courts may admit self-incriminating statements when the self-incriminating statements are spontaneous, *United States v. Sherwood*, 98 F.3d 402, 409 (9th Cir. 1996), or when the self-incriminating statements are unsolicited, *United States v. Rodriguez-Lopez*, 63 F.3d 892,893 (9th Cir. 1995).

#### 2. Analysis

Before reading his *Miranda* rights, Agent Crawford asked Mr. Gilmore if he knew why he was being held at the border. Mr. Gilmore responded about "the thing in [his]

pocket." Agent Crawford's question, proffered in a custodial setting and before giving *Miranda* warnings, would reasonably lead to an incriminating statement. Therefore, Mr. Gilmore's response is suppressed.

Agent Crawford subsequently gave the *Miranda* warnings, and Mr. Gilmore acknowledged that he understood. Before invoking his rights, Mr. Gilmore then asked follow up questions to ascertain if he was arrested for the bag found on his person, or if there were other charges brought against him. When Mr. Gilmore learned that CBP officers found drugs in the spare tire, he said that he wanted to speak with an attorney. He then made a series of unsolicited statements that he was not driving his own truck, and that his own truck had been stolen. These statements were unsolicited, *United States v. Rodriguez-Lopez*, 63 F.3d at 893, and therefore are not suppressed. .

### B. Mr. Gilmore's Second Interrogation with Agents Crawford and Sheridan

#### 1. Legal Standard

The U.S. Supreme Court adopted a separate layer of preventative measures for instances when a suspect invokes the right to an attorney and remains in custody. This rule, set out in *Edwards v. Arizona*, 451 U.S. 477 (1981), states that when a suspect invokes the right to an attorney, law enforcement must cease the interrogation and may continue only when the suspect's attorney is present or when the suspect "initiates further communication, exchanges, or conversations" with law enforcement. *Edwards*, 451 U.S. at 485. The purpose of the *Edwards* rule is to preserve the suspect's choice to communicate with authorities through counsel by preventing law enforcement "from badgering a defendant into waiving his previously asserted *Miranda* rights." *Michigan v. Harvey*, 494 U.S. 344, 350 (1990). The *Edwards* rule ensures that law enforcement "will not take advantage of the mounting coercive pressures of 'prolonged police custody.'" *Maryland v. Shatzer*, 559 U.S. 98, 105 (2010) (quoting *Arizona v. Roberson*, 486 U.S. 675, 686 (1988)). If a suspect initially invokes the right to counsel, "any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is

itself the product of the 'inherently compelling pressures' and not the purely voluntary choice of the suspect." *Arizona v. Roberson*, 486 U.S. at 681 (quoting *Miranda*, 384 U.S. at 467). Therefore, any subsequent waiver is presumed invalid when a suspect invokes the right to counsel, and then law enforcement continues to hold the suspect in custody and later asks the suspect to waive his or her rights. *Edwards*, 451 U.S. at 485.

The *Edwards* presumption does not apply if the suspect, and not law enforcement, initiates the subsequent conversation. *Oregon v. Bradshaw*, 462 U.S. 1039, 1044 (1983). In *Oregon v. Bradshaw*, a suspect invoked his right to counsel, and the police prepared to transfer him to an overnight holding cell. During the transition, the suspect asked a police officer, "Well, what is going to happen to me now?" Although the officer responded that they should not speak because of the suspect's request for the attorney, the suspect said that he understood and asked questions about potential charges and where he would be held that night. As part of this conversation, the officer suggested that the suspect take a polygraph test. The suspect agreed and took a polygraph test. The Court held that the *Edwards* rule did not apply because the suspect initiated the subsequent conversation when he asked, "Well, what is going to happen to me know?" *Oregon v. Bradshaw*, 462 U.S. at 1045-47.

If the suspect initiates renewed discussions, the *Edwards* rule does not apply, and the next inquiry is whether the subsequent waiver is valid. Under those circumstances, the government still has the burden "to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation." *Oregon v. Bradshaw*, 462 U.S. at 1044. For a subsequent waiver to be valid, it must be "knowing and intelligent and found to be so under the totality of the circumstances." *Edwards v. Arizona*, 451 U.S. 477, n.9 (1981). Courts consider the case's particular facts and circumstances, including the suspect's background, experience, and conduct. *Oregon v. Bradshaw*, 462 U.S. at 1044; *North Carolina v. Butler*, 441 U.S. 369, 374-75 (1979); *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

### 2. Analysis

The Court first addresses whether Mr. Gilmore initiated the exchange that led to Mr. Gilmore's revocation of his rights.

In Mr. Gilmore's case, the *Edwards* rule does not apply because Mr. Gilmore initiated the subsequent conversation with law enforcement. According to the record, Officer Soto simply asked Mr. Gilmore if he remembered their previous encounter and then admonished Mr. Gilmore to be honest. The conversation was not coercive and does not suggest badgering. The conversation between Officer Soto and Gilmore was not a topic of discussion in the initial interview between Gilmore and Agents Crawford and Sheridan discussed above. And the videotapes of Crawford's holding cell indicate that there was no conversation between Officer Soto and Gilmore thereafter.

Despite the conflicting stories leading to the second interrogation, the undisputed transcript of the second interrogation shows that Mr. Gilmore initiated the conversation. In the first question of the second interrogation, Agent Crawford said to Mr. Gilmore, "you asked to speak with us again" and "you wanted to talk to us." (Doc. 20-2 at lines 12-13). Later in the interview, Agent Crawford reiterated, "You wanted to talk to us . . ." and Mr. Gilmore responded, "Yeah I mean, to clarify this up . . . ." (Doc. 20-2 at lines 700-02). Even later, Mr. Gilmore complained about some pain and his inability to receive Tylenol. Agent Sheridan said, "we gave you the decision that we could either call (EMS) or we could take you up to the jail . . . but you wanted to talk to us first so . . . we gave you that chance[.]" Mr. Gilmore responded, "Yeah that's true." (Doc. 20-2 at lines 1351-59).

Accordingly, the Court finds that Mr. Gilmore initiated the second interrogation that led to the waiver. Consequently, the *Edwards* presumption of inadmissibility does not apply.

Although Mr. Gilmore initiated the conversation, the Court must still find that the subsequent waiver is valid. As noted, the Court reviews the totality of the circumstances and the case's specific facts, such as the suspect's experience and conduct. *Oregon v.*

*Bradshaw*, 462 U.S. 1039, 1044 (1983).

Throughout the second interrogation, Mr. Gilmore did not speak as if he felt coerced to speak with law enforcement or as if he was in any noticeable distress. Agent Crawford carefully read Mr. Gilmore his rights, informed him that he could end the conversation at any time, and handed him a written copy of his rights. Mr. Gilmore waived his rights both orally and in writing. After waiving his rights, Mr. Gilmore asked the first question. ("No idea what my bail will be set at?") (Doc. 20-2 at line 64).

Mr. Gilmore also showed that he understood the general repercussions of his decision to speak with the special agents. Although Mr. Gilmore reports that Officer Soto led him to believe that he could go home if he cooperated and told the truth, in the transcript of the second interrogation, Mr. Gilmore without solicitation said, "If I tell you the truth – I mean, that's not gonna get me outta jail here either." (Doc. 20-2 at line 1498).

Further, the facts do not show that Mr. Gilmore felt pressured to speak with the special agents because of the coercive nature of being held in custody. Although Mr. Gilmore complained of stomach cramps and pain, the special agents told him that they could call Emergency Medical Technicians, take him to the hospital, or that he could likely see a doctor at the county jail when they transported him later that evening. Mr. Gilmore subsequently asked to speak with the special agents a second time and knowingly delayed his transport to the county jail to receive medical attention.

Mr. Gilmore never appeared to be in serious distress while held in custody. Although he mentioned pain five times during the second interview, he never referenced pain as a sudden or spontaneous request for help. Each reference to pain came when the special agents expressed confusion, and Mr. Gilmore then mentioned his stomach pain as a reason why his statements might be unclear. Lastly, near the end of the second interview, Agent Crawford said, "[W]e'll go ahead and get this wrapped up and take you to jail so they can give you Tylenol." (Doc. 20-2 at line 1361-65). Mr. Gilmore said, "Okay," and then continued the conversation, saying, "So I mean . . . it's gonna be crazy

in front of a judge . . . and that's why I thought about it and I was, like, 'Well talkin' to a lawyer first is gonna help?'" In view of his conduct and his statements during the interview, Mr. Gilmore's stomach pain did not seriously influence his conversation with the special agents. Therefore, his time in custody did not coerce him to speak with law enforcement and waive his rights.

In view of the totality of Mr. Gilmore's specific circumstances, the Court finds that Mr. Gilmore knowingly and intelligently waived his rights. The Court thus denies Mr. Gilmore's motion to suppress statements during the second interrogation.

### C. Mr. Gilmore's Conversation with Agent Sheridan during Transport

#### 1. Legal Standard

As previously noted, courts may admit self-incriminating statements when the self-incriminating statements are spontaneous, *United States v. Sherwood*, 98 F.3d 402, 409 (9th Cir. 1996), or when the self-incriminating statements are unsolicited, *United States v. Rodriguez-Lopez*, 63 F.3d 892,893 (9th Cir. 1995).

#### 2. Analysis

According to the limited record, Agent Sheridan transported Mr. Gilmore to the Yuma County Detention Center and did not ask any questions during transport prior to Mr. Gilmore making voluntary statements. Without solicitation, Mr. Gilmore told Agent Sheridan about an individual who recruited him to transport narcotics. Mr. Gilmore described the process and prices in the offer and stated that he rejected the offer. (Doc. 46-1).

Because Mr. Gilmore's statements during transport were unsolicited, the Court does not suppress these statements.

## II. Voluntariness

Mr. Gilmore separately claims that his statements are inadmissible because they were involuntary.

### A. Legal Standard

The Fifth Amendment right against self-incrimination and the Due Process Clause

1 of the Fourteenth Amendment require that confessions must be voluntary to be admissible. *Dickerson v. United States*, 530 U.S. 428, 433 (2000). The government must prove by a preponderance of the evidence that a confession is voluntary. *Lego v. Twomey*, 404 U.S. 477, 489 (1972). Courts determine voluntariness based on "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Dickerson*, 530 U.S. at 434 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). The analysis "often consider[s] the following factors: the youth of the accused, his intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003) (citing *Schneckloth*, 412 U.S. at 226). "[A] voluntary *Miranda* waiver is sufficient at the time of an initial attempted interrogation to protect a suspect's right to have counsel present, but it is not sufficient at the time of subsequent attempts if the suspect initially requested the presence of counsel." *Maryland v. Shatzer*, 559 U.S. 98, 105 (2010).

This standard is similar to—if not the same as—the standard for admissibility under *Edwards* when the suspect initiates a subsequent waiver of rights.

**B. Analysis**

As previously discussed, Mr. Gilmore received adequate opportunities to invoke his rights, and he was held in custody for a relatively short amount of time with water and snacks. Although he was in some pain, he was offered immediate medical attention and declined it. His demeanor in the videotaped interview did not suggest that he was in sufficient pain to render his statements involuntary. He independently chose to speak with special agents and delayed an opportunity to receive medical attention. For these reasons, and those reasons discussed in Section I.B.2, *supra*, the Court finds that Mr. Gilmore's statements were voluntary.

/ / /

/ / /

**CONCLUSION**

As discussed, the Court grants Mr. Gilmore's motion to suppress those statements made during the first interrogation with Agents Crawford and Sheridan before receiving a *Miranda* warning. The Motion is otherwise denied in its entirety.

**IT IS THEREFORE ORDERED** that the Defendant's Motion to Suppress, (Doc. 20), is **GRANTED** in part and **DENIED** in part.

Dated this 11th day of September, 2017.

Honorable G. Murray Snow
United States District Judge